IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DARRELL JOHNSON,

       Plaintiff,                     No. 2:12-cv-00812-KJM-JFM

      vs.

COUNTY OF YOLO, EDWARD G.
PRIETO, DOES 1-10, INCLUSIVE,

       Defendants.               <u>ORDER</u>

_____/

        Defendants Yolo County ("County") and Edward Prieto ("Prieto") (collectively, "defendants") filed a summary judgment motion contending plaintiff's racial harassment, discrimination, intentional infliction of emotional distress ("IIED"), and negligence claims fail as a matter of law.  (ECF 9.)  The court held a hearing on this matter on January 18, 2013; Cori Sarno appeared for defendants and Manolo Olaso appeared for plaintiff.  For the reasons set forth below, defendants' motion for summary judgment is GRANTED.

I.      <u>UNDISPUTED FACTS AND PROCEDURAL HISTORY</u>

        Plaintiff, an African-American, worked as a deputy sheriff with the Yolo County Sheriff's Department at all times relevant to this case.  (Compl. ¶ 14.)  On September 28, 2011, Sheriff Prieto ("Prieto"), who is Hispanic, spoke at a meeting of the deputies working out of the

1  Yolo courts, at which approximately twenty-five deputies were present.  (Johnson Depo. at 56-

2  57, 63, ECF 9-5.)  At this meeting, after Prieto had finished addressing the deputies, he asked if

3  anyone had any questions.  (*Id.* at 59.)  No one said anything; Prieto then looked at plaintiff and

4  said, "Gravy, you have any questions?"  (*Id.*)  Plaintiff, unsure whom Prieto was addressing,

5  looked to his left at Deputy Torrez.  (*Id.*)  Apparently noticing plaintiff's uncertainty, Prieto

6  looked straight at plaintiff and said, "You, the dark one."  (*Id.*)  As plaintiff was the only

7  African-American in the room and as Prieto was looking directly at him, plaintiff believed Prieto

8  was talking to him.  (*Id.* at 59-60.)  Plaintiff interpreted both terms to be offensive, not

9  "descriptive."  (*Id.* at 60.)  Plaintiff responded that he did not have any questions.  (*Id.* at 63.)

10 Immediately after using the term "dark one," and following plaintiff's reply that he had no

11 questions, Prieto started telling an anecdote about when he was younger and he used to play with

12 his cousin.  (*Id.*)  His aunt, who would supervise the two, would refer to Prieto as "the dark one"

13 because he was darker than his cousin.  (*Id.* at 60-61.)  At this point, the meeting was adjourned.

14 (*Id.* at 61.)

15         After the meeting, Deputies Zetwick, Powell, Hembry, Whitehead and McMaster

16 expressed support for plaintiff by telling him they thought Prieto's comments at the meeting

17 were inappropriate.  (*Id.* at 65-66, 75.)  Yet each of these deputies, except Whitehead, at some

18 point after the meeting also called Johnson "gravy."   Hembry called plaintiff "gravy" and then

19 said "Oh, I'm just messing around" or "I'm just kidding," and stated he also was tired of Prieto

20 calling him names.  (*Id.* at 50-51).  McMaster called plaintiff "gravy" in passing; in response,

21 plaintiff pretended to write down his name on an index card, while saying McMaster should not

22 be using that term.  (*Id.* at 72-74.)  McMaster replied that he did not say "the whole thing;"

23 rather, he stated that he only said "Gravy, but I didn't say dark one."  (*Id.* at 76.)  Powell said

24 "Hey gravy" to plaintiff, and plaintiff responded "You can't be saying that."  (*Id.* at 80-81.)

25 Powell then said, "The sheriff said it, Gravy."  (*Id.* at 82.)  Zetwick, on three to five occasions

26 when the lieutenant said a court room was "dark," meaning not in session, commented to the

2

group that the courtroom was "dark like gravy." (*Id.* at 85-88.)  On one occasion, plaintiff

overheard Deputy Ney, while speaking with another person, use the term "dark one." (*Id.* at 90-

92.)  Plaintiff assumed the term was in reference to him, although he could not remember what

the context of the discussion was or who Ney was speaking to.  (*Id.* at 91-92.)  Despite these

deputies' use of "gravy" and "dark one," plaintiff asserts he got on well with all the deputies and

considered them his friends.  (*Id.* at 30, 82.)  All these comments occurred between September

28 and October 13, 2011, during which time plaintiff worked a total of nine days.  (*Id.* at 42-43.)

On October 13, 2011, plaintiff first complained to the County about Prieto's and

the deputies' comments by submitting a formal complaint to Mindi Nunes in the county Human

Resources Department.  (*Id.* at 65, 94.)  The next day, Lieutenant Carter Vaughn approached

plaintiff and asked him what he wanted done in response to his complaint.  (*Id.* at 105.)  Vaughn

asked if plaintiff wanted him to instruct the other deputies to call each other by name only.  (*Id.*)

Plaintiff responded "No, people joke around.  I mean guys joke around sometimes.  I just want

you to just tell 'em what the sheriff said was wrong and offensive." (*Id.*)  Vaughn agreed to this.

(*Id.*)  Plaintiff never requested Vaughn tell the other deputies to stop using the terms he found

offensive.  (*Id.* at 111.)  However, Vaughn called a meeting with all the deputies, at which he

told the deputies what Prieto said was wrong and instructed the deputies not to repeat those terms

plaintiff found offensive, on pain of discipline.  (*Id.*)  Vaughn also made every deputy read and

sign the county's harassment policy.  (*Id.*)  After this October 14, 2011 meeting, none of the

deputies repeated any of the terms plaintiff found offensive.

Plaintiff left work on October 19, 2011, saying he needed time off because he felt

stressed that people who should have protected him, including Vaughn, did nothing.  (*Id.* at 125.)

Plaintiff asserts Vaughn heard Prieto use the offensive terms at the September 28 meeting, yet no

one at the department took action until plaintiff complained.  (*Id.* at 106-107.)  Plaintiff told

Vaughn he believed the other deputies felt plaintiff snitched and were upset with him.  (*Id.* at

123-124.)  Plaintiff never returned to work.  (*Id.* at 43.)

In January 2012, plaintiff's doctor issued him a note authorizing him to return to work with the restriction that he avoid contact with Prieto.  (*Id.* at 179; Ex. B, ECF 9-6.)  On January 13, Nunes, Director of Human Resources, sent plaintiff a letter offering him a temporary position as a probation officer and directing him to report to that position by January 23.  (*Id.* at 184-85; Ex. C, ECF 9-6.)  Plaintiff did not report to work as a probation officer because he felt he was being offered an insulting demotion.  (Johnson Depo. at 186-191.)  However, plaintiff never inquired about the particulars of the job, including salary.  (*Id.*)  On March 16, plaintiff's doctor placed an additional work restriction on his authorization to work: plaintiff was not allowed to have any contact whatsoever with the Yolo County Sheriff's Department.  (Johnson Depo. at 201-202; Exs. E & F, ECF 9-6; Nunes Decl. ¶¶ 3, 6-7, ECF 9-8.)  The County informed plaintiff by letter that there were no law enforcement positions available at the County that complied with his doctor's restriction.  (Johnson Depo. at 201-202; Nunes Decl. ¶¶ 3, 6-7.)  In response to this letter, plaintiff's counsel sent the County a letter on April 18 informing them plaintiff considered himself constructively terminated.  (*Id.* at 203-205; Ex. G, ECF 9-6.)

Plaintiff filed his complaint in this action on March 29, 2012, alleging five causes of action.  (ECF 1.)  Defendants filed this summary judgment motion on December 4, seeking summary judgment on all five claims.  (ECF 9.)  Plaintiff timely filed an opposition on January 4, 2013, in which plaintiff abandoned his third cause of action, which pled constructive termination.  (ECF 10 at 12.)  Defendants timely filed a reply on January 11, 2013.  (ECF 14.)

II.    SUMMARY JUDGMENT STANDARD

A court will grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  The "threshold inquiry" is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

1    The moving party bears the initial burden of showing the district court "that there

2    is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*,

3    477 U.S. 317, 325 (1986).  The burden then shifts to the nonmoving party, who "must establish

4    that there is a genuine issue of material fact . . . ." *Matsushita Elec. Indus. Co. v. Zenith Radio*

5    *Corp.*, 475 U.S. 574, 585 (1986).  In carrying their burdens, both parties must "cit[e] to

6    particular parts of materials in the record . . .; or show [] that the materials cited do not establish

7    the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible

8    evidence to support the fact." FED. R. CIV. P. 56(c)(1); *see also Matsushita*, 475 U.S. at 586

9    ("[the nonmoving party] must do more than simply show that there is some metaphysical doubt

10   as to the material facts").  Moreover, "the requirement is that there be no *genuine* issue of

11   *material* fact . . . . Only disputes over facts that might affect the outcome of the suit under the

12   governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at

13   247-48 (emphasis in original).

14   In deciding a motion for summary judgment, the court draws all inferences and

15   views all evidence in the light most favorable to the nonmoving party.  *Matsushita*, 475 U.S. at

16   587-88; *Whitman v. Mineta*, 541 F.3d 929, 931 (9th Cir. 2008).  "Where the record taken as a

17   whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine

18   issue for trial.'"  *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Arizona v. Cities Serv.*

19   *Co.*, 391 U.S. 253, 289 (1968)).

20   III.   ANALYSIS

21   Plaintiff proceeds on four causes of action against defendants.[1]  In his first and

22   second causes of action, plaintiff brings claims under Title VII and California's Fair

23   Employment and Housing Act ("FEHA"), respectively, for both employment discrimination and

24

25   [1] As noted above, plaintiff initially brought five causes of action, but he abandoned his
     third claim, constructive termination, in his opposition.  (ECF 10 at 12.)  That cause of action is
26   accordingly dismissed and the court will not address it in this motion.

1    harassment.  Because the legal standards for Title VII and FEHA are similar but the standards

2    for establishing discrimination and harassment are distinct, the court will examine harassment

3    under both Title VII and FEHA and will then examine discrimination under both laws.  The

4    court will then turn to plaintiff's IIED and negligence claims.

5         A.    Harassment under Title VII and FEHA

6              Plaintiff relies on a hostile work environment theory to prove his harassment

7    claim.  (Compl. ¶ 30; ECF 10 at 7-9.)  Defendants assert plaintiff has not proven he was

8    subjected to a hostile work environment.[2]  (ECF 9 at 6-9.)  Defendants compare plaintiff's work

9    treatment to that of the plaintiff in *Manatt*, in which the Ninth Circuit held that "simple teasing,

10   offhand comments, and isolated incidents (unless extremely serious) will not amount to

11   discriminatory changes in the 'terms and conditions of employment.'" (*Id.* at 7 (quoting *Manatt*

12   *v. Bank of Am.*, 339 F.3d 792, 798 (9th Cir. 2003)).)  Defendants argue the plaintiff in *Manatt*, a

13   Chinese woman, was subjected to much more serious and offensive conduct than plaintiff in this

14   case, yet the Ninth Circuit found that conduct did not rise to the level of creating a hostile work

15   environment.  (*Id.*)

16             In *Manatt*, the plaintiff's coworkers "jokingly" used the terms "China man" and

17   "rickshaw" around plaintiff, and the plaintiff overheard a coworker make comments about

18   Chinese eyes to the plaintiff's supervisor.  339 F.3d at 795.  That same coworker also told

19   plaintiff, "I've had the worst kind of trouble with your countrymen."  *Id.*  Coworkers made jokes

20   about the plaintiff's pronunciation of words, called her "China woman," and made her repeat

21   certain words for the entertainment of business associates over the phone.  *Id.*  Coworkers would

22   also pull back their eyes with their fingers to imitate or mock the appearance of Asians.  *Id.*  All

23   these incidents occurred over a span of two-and-a-half years, until the plaintiff finally spoke to

24

25   [2] Defendants also argue that plaintiff's harassment claims fail because the County took prompt and effective corrective action after plaintiff complained about the Sheriff's slurs to his supervisor.  (ECF 9 at 9-10.)  Because the court finds plaintiff does not establish a prima facie

26   case of harassment, it is not necessary to reach this argument.

1  human resources and to her supervisor.  *Id.* at 795-96.  Her supervisor told her she "shouldn't

2  have" contacted human resources because her coworkers were just joking.  *Id.* at 796.  The

3  supervisor nonetheless scheduled a staff meeting to discuss the matter and instructed the

4  plaintiff's peers to be more sensitive about each other's feelings, at which point the jokes

5  stopped.  *Id.*  Because the harassment in *Manatt* was insufficient to create a hostile work

6  environment as a matter of law, defendants assert this court should conclude the same here.

7  (ECF 9 at 7-9.)

8          Plaintiff does not address defendants' *Manatt* argument in his opposition.

9  Instead, plaintiff argues that a single incident of harassment by a supervisor may be enough to

10  create a hostile work environment.  (ECF 10 at 8 (citing *Brooks v. San Mateo*, 229 F.3d 917, 927

11  n.9 (9th Cir. 2000)).)  Plaintiff claims that one or two epithets, when uttered by a supervisor, are

12  sufficient.  (*Id.* (citing *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir.

13  1994)).)  Because Prieto, who is in a supervisory position as sheriff, called plaintiff "gravy" and

14  "dark one," plaintiff says, a fact finder could conclude there was a hostile work environment.

15  (*Id.* at 8-9.)  Moreover, plaintiff asserts Prieto is so influential that his "slurs seemed to catch on

16  like wildfire."  (*Id.* at 9.)  Therefore, several deputies plaintiff "thought were his friends" began

17  calling him "gravy" despite his informing them he found the term offensive.  (*Id.*)  Finally,

18  plaintiff asserts the "backlash" he suffered after informing Lieutenant Vaughn of the slurs, and

19  after Vaughn made the deputies read and sign the harassment policy, also contributed to the

20  hostile work environment.[3]  (*Id.*)  In short, plaintiff argues a reasonable jury could find the

21

22          [3] Plaintiff cites to his deposition (Johnson Depo. at 123: 3-10) as proof of a backlash.
   When asked "[w]hy do you think that [the other deputies] felt that you had snitched?," plaintiff
23  responded that other deputies grumbled at having to sign the harassment policy.  Plaintiff also
   concedes that no one directly called him a snitch, and plaintiff does not assert any actual facts
24  suggesting he suffered a "backlash."  In his separate statement of undisputed facts, plaintiff also
   cites to lines 124:1-11 of his deposition to support his assertion of a backlash.  (Pl.'s Undisputed
25  Facts ¶ 11, ECF 11.)  But these lines merely describe plaintiff's asking Vaughn for time off after
   the harassment policy signings.  The court does not consider the naked assertion of an
26  undisputed fact in deciding this motion.

totality of these circumstances sufficiently "severe and pervasive that it created a hostile work environment." (*Id.*)

Under Title VII, to prove a prima facie case that such an environment existed, plaintiff must show that: 1) he was "subjected to verbal or physical conduct [because of his race], 2) this conduct was unwelcome, and 3) the conduct was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Fuller v. City of Oakland*, 47 F.3d 1522, 1527 (9th Cir. 1995) (quoting *Ellison v. Brady,* 924 F.2d 872, 875-76 (9th Cir. 1991)); *see also Manatt*, 339 F.3d at 798.  The working environment must be perceived both subjectively and objectively as abusive.  *Id.* (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993)).  "Whether the workplace is objectively hostile must be determined from the perspective of a reasonable person with the same fundamental characteristics." *Id.* (citing *Ellison,* 924 F.2d at 879).  The hostility of the workplace is measured based on the totality of the circumstances, which may include frequency, severity, whether there is a physical component or a mere offensive utterance, and whether the activity unreasonably interferes with the employee's work performance.  *Harris,* 510 U.S. at 22-23.  "However, even if a hostile working environment exists, an employer is only liable for failing to remedy harassment of which it knows or should know." *Fuller*, 47 F.3d at 1527 (citing *Ellison,* 924 F.2d at 881).

Similarly, under FEHA, plaintiff must prove, among other things, that the harassment based on race "unreasonably interfered with his or her work performance by creating an intimidating, hostile, or offensive work environment." *Thompson v. City of Monrovia*, 112 Cal. Rptr. 3d 377, 390 (Cal. Ct. App. 2010).  The victim must subjectively perceive the message as offensive and the message must also be offensive to a reasonable employee of the victim's race.  *Id.* at 390-91 (citing *Nazir v. United Airlines, Inc.*, 100 Cal. Rptr. 3d 296, 314 (Cal. Ct. App. 2009)).  The harassment cannot be "'occasional, isolated, sporadic, or trivial[;] rather the plaintiff must show a concerted pattern of harassment of a repeated, routine, or a

/////

8

1  generalized nature.'" *Id.* (quoting *Aguilar v. Avis Rent A Car Sys.*, 21 Cal. 4th 121, 131 (Cal.

2  1999)).

3          Here, the court finds that plaintiff has not established a prima facie case of

4  harassment under Title VII or FEHA.  Even assuming the terms "gravy" and "dark one," as

5  directed at plaintiff by Sheriff Prieto and other deputies, are subjectively and objectively

6  offensive slurs, they were neither frequent enough nor severe enough to create a hostile work

7  environment under Title VII or FEHA.  *See Harris,* 510 U.S. at 22-23; *Thompson*, 112 Cal. Rptr.

8  3d at 390.  Comparisons to the facts in *Manatt* and plaintiff's cited case *Rodgers* are instructive.

9  The plaintiff in *Manatt* endured more severe and numerous slurs, over two-and-a-half years, than

10 those endured by plaintiff here over a period slightly longer than two weeks, during which

11 plaintiff worked nine days.  *Manatt*, 339 F.3d at 795-76.  (*See* Johnson Depo. at 42-43.)  Plaintiff

12 was called "gravy" and "dark one" by Prieto once (Johnson Depo at 59-60), and Deputy Zetwick

13 made comments about rooms being "dark like gravy" in plaintiff's presence on three to five

14 occasions (*id.* at 85-88).  After Prieto's inappropriate comments, at least five deputies expressed

15 support to plaintiff by saying they thought Prieto's comments were inappropriate.  (*Id.* at 65-66,

16 75.)  Three other deputies used the term "gravy" toward plaintiff (*id.* at 50-51, 72-74, 80-81); on

17 one occasion Hembry responded to plaintiff's subsequent complaint about the offense by saying,

18 "I'm just kidding," and adding that Prieto's comments were "wrong and messed up" (*id.* at 51).

19 Considered together and in context, these comments do not rise to the level of hostility necessary

20 to sustain a harassment claim.

21          It is true the supervisor in *Manatt* did not initiate the use of the slurs or even utter

22 the slurs, as did Prieto here.  But the supervisor in *Rodgers*, on which plaintiff relies, exhibited

23 conduct far more abusive, offensive, and frequent than that of defendant Prieto here.  The

24 supervisor in *Rodgers*, who was white, called the plaintiff, who was black, among other things,

25 the offensive name "nigger" five to ten times over Rodger's five-year employment.  12 F.3d at

26 671.  Six months before Rodgers quit, his supervisor told him, "You black guys are too fucking

1  dumb to be insurance agents."  On another occasion he told Rodgers that the regional vice

2  president had advised the supervisor not to hire any more black agents.  *Id.*  Rodgers finally quit

3  after he began suffering health problems caused by stress from his boss's racist comments and

4  from the increased workload his boss was giving him.  *Id.* at 671-72.  In the instant case, Prieto's

5  single use of "gravy" and "dark one," which Prieto, who is Hispanic, followed up with a story

6  about how his aunt called him "the dark one" because he was darker than his cousin (ECF 10-1

7  at 2 ¶ 4), is not nearly as egregious.  While the court is not unsympathetic to plaintiff's plight,

8  the law does not make every such plight actionable.  The court grants defendants summary

9  judgement on plaintiff's harassment claims under Title VII and FEHA.

10         B.      Discrimination under Title VII and FEHA

11              Plaintiff also contends defendants discriminated against him on account of his

12  race in violation of Title VII and FEHA.[4]  Defendants argue plaintiff cannot prove he suffered

13  any form of adverse employment action, defined as "an act by the employer which materially

14  affects the compensation, terms, conditions or privileges of employment."  (ECF 9 at 11 (citing

15  *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 970 (9th Cir. 2001)).)  Examples of such

16  adverse actions under Title VII and FEHA, according to defendants, include "'hiring, firing,

17  failing to promote, reassignment with significantly different responsibilities, or a decision

18  causing a significant change in benefits.'"  (*Id.* (quoting *Piercy v. Maketa*, 480 F.3d 1192, 1203

19  (10th Cir. 2007)).)  Failing to comply with plaintiff's requested accommodation is not an adverse

20  employment action as a matter of law, defendants argue.  (*Id.* (citing *Anderson v. State of*

21  *Arizona*, No. CV06-00817-PHX-NVW, 2007 U.S. Dist. LEXIS 36399 (D. Ariz. May 15,

22  2007)).)

23

24         [4] Plaintiff does not name Prieto as a defendant in his Title VII claims.  However, Prieto is
   a named defendant in plaintiff's FEHA claim.  FEHA, however, does not countenance
25  discrimination suits against individuals, but only against employers.  *Jones v. Lodge at Torrey
   Pines P'ship*, 42 Cal. 4th 1158, 1167-74 (Cal. 2008).  Hence, plaintiff's FEHA discrimination
26  claim against Prieto is not actionable.

1    Additionally, defendants contend plaintiff made no effort to determine if other positions were

2    available or if his restriction could be adjusted; instead, he decided to resign.  (*Id.*)

3          Finally, defendants argue that even if plaintiff established a prima facie case of

4    discrimination, defendants have articulated a legitimate, non-discriminatory reason for not being

5    able to accommodate plaintiff's restriction.  (*Id.*)  And plaintiff, defendants maintain, cannot

6    carry his burden showing that this reason was pretextual.  (*Id.*)  Defendants contend plaintiff has

7    not alleged that Nunes, the County's Director of Human Resources, harbored any discriminatory

8    animus, and plaintiff has no evidence that Prieto was part of the County's decision about which

9    jobs fit plaintiff's medical restriction.  (*Id.* at 12-13.)  Even if Prieto was part of that decision,

10   defendants assert, plaintiff has no evidence of Prieto's discriminatory motivation apart from his

11   comments in the September 28 meeting.  (*Id.*)

12         Plaintiff, in his opposition, focuses solely on the adverse employment action

13   issue.  Plaintiff argues the Ninth Circuit maintains a broad view of what constitutes an adverse

14   employment action.  (ECF 10 at 11 (citing *Ray v. Henderson*, 217 F.3d 1234, 1240-41 (9th Cir.

15   2000)).)  The *Ray* court, plaintiff asserts, held that an adverse employment activity is one that is

16   reasonably likely to deter employees from engaging in a protected activity, thus plaintiff need

17   not show defendants' adverse action "affected some ultimate employment decision such as

18   hiring, granting leave, discharging, promoting or compensation."  (*Id.*)  Plaintiff was treated

19   differently, he contends, when defendants allowed his color and race to be demeaned at the

20   hands of Prieto and other deputies.  Plaintiff essentially argues he suffered two adverse

21   employment actions.  First, defendants did nothing when other deputies concluded plaintiff was a

22   snitch, after plaintiff complained to Vaughn and human resources about the slurs.  (*Id.*)  Second,

23   the defendants failed to find plaintiff some other employment position, which is evidence of their

24   unwillingness to accommodate plaintiff based on race.  (*Id.*)

25         To establish a prima facie case of discrimination under Title VII when no direct

26   evidence of discrimination exists, a plaintiff must prove: "1) that the plaintiff belongs to a class

11

of persons protected by Title VII; 2) that the plaintiff performed his or her job satisfactorily; 3) that the plaintiff suffered an adverse employment action; and 4) that the plaintiff's employer treated the plaintiff differently than a similarly situated employee who does not belong to the same protected class as the plaintiff." *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006). Discrimination under FEHA is proven using the same factors. *McCauley v. Stanford Med. Ctr.*, No. C 07–1784 JF (RS), 2009 WL 650359, at *6 (N.D. Cal. March 11, 2009).

Once a plaintiff proves a prima facie case, the burden shifts to the defendant to prove the defendant "undertook the challenged employment action for a 'legitimate, nondiscriminatory reason.'" *Cornwell*, 439 F.3d at 1028 (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). If the defendant makes this showing, the plaintiff must meet his burden on summary judgment by demonstrating a reasonable jury could conclude, by a preponderance of the evidence, that the defendant took the challenged employment action because of the plaintiff's race. *Id.* The Supreme Court has identified two methods by which a plaintiff can meet this burden: by showing either that a "'discriminatory reason more likely motivated the employer'" or that the "'employer's proffered explanation is unworthy of credence.'" *Id.* (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). "A plaintiff may not defeat a defendant's motion for summary judgment merely by denying the credibility of the defendant's proffered reason for the challenged employment action," nor "may a plaintiff create a genuine issue of material fact by relying solely on the plaintiff's subjective belief that the challenged employment action was unnecessary or unwarranted." *Id.* at 1028 n.6.

The court finds that even if plaintiff has initially established a prima facie case, he does not carry his burden at step three. In his opposition, the only plausible adverse employment action plaintiff maintains he suffered is defendants' failure to find him other employment that

/////

/////

accommodated his medical restriction.[5]  Even assuming defendants' initial offer of a position as

a probation officer, which plaintiff refused, also qualified as an adverse employment action,

defendants have articulated a legitimate and nondiscriminatory reason for offering plaintiff the

probation officer position.  They also have provided a legitimate reason, upon receiving

plaintiff's new medical restriction, for not offering plaintiff a position at all: no other qualifying

positions were available.  (Nunes Decl. ¶¶ 3, 6.)  The evidence demonstrates that only three

departments at the County employ peace officers: the sheriff's department, the probation

department, and the district attorney's office.  (*Id.* ¶ 3.)  Following the receipt of plaintiff's

January 5, 2012 doctor's note, the only vacant and funded position available that accommodated

plaintiff's first medical restriction, no contact with Prieto, was in the probation department.  (*Id.*)

Plaintiff never contacted the probation department or Nunes to learn about the pay or other

particulars of this job; he simply did not show up on his scheduled start date.  (*Id.*)  Upon receipt

of plaintiff's March 16, 2012 doctor's note, which contained the restriction that plaintiff have no

contact with the entire Sheriff's Department, there existed no position as a peace officer within

the County that could accommodate plaintiff's restriction, because all peace officer positions in

the County have some contact with the Sheriff's Department.  (*Id.* ¶¶ 5-6.)  These are

nondiscriminatory reasons for the alleged adverse employment actions; thus, the burden now

shifts to plaintiff to show that a discriminatory reason more likely motivated defendants or that

defendants' proffered explanation is unworthy of credence.  *Cornwell*, 439 F.3d at 1028.

Nor is there any evidence in the record suggesting defendants' stated reason for

their conduct is pretextual.  Plaintiff does not allege Prieto had anything to do with the County's

employment offers, and he does not allege Nunes harbored racial animosity towards him.

---

[5] Plaintiff does not provide factual support for any backlash after complaining about his treatment to his superiors.  *See* note 3 *supra*.  Moreover, plaintiff does not explain how defendants' failure to act in this circumstance constitutes an adverse employment action; rather, he simply states, conclusorily, that it does.  Hence, the court will not consider plaintiff's first argument for an adverse employment action.

1   Plaintiff has not established a nexus between Prieto's slurs, his fellow deputies' repetition of

2   those slurs, and the alleged adverse employment actions he suffered such that any argument for

3   pretext can be inferred.  *See Vasquez v. County of Los Angeles*, 349 F.3d 634, 640-41 (9th Cir.

4   2003) (no discrimination when plaintiff could not connect discriminatory acts to decisionmakers

5   involved in adverse employment action).  The court grants defendants summary judgment on

6   plaintiff's discrimination claim under Title VII and FEHA.

7          C.      IIED

8                  Under California law, a public entity cannot be liable for common law torts unless

9   specifically authorized by statute.  CAL. GOV'T CODE § 815(a); *Milosky v. Regents of the Univ.*

10  *of Cal.*, 44 Cal. 4th 876, 900-01 (Cal. 2008).  However, a public entity may be found vicariously

11  liable for employees' tortious acts.  CAL. GOV'T CODE § 815.2; *Davison v. Santa Barbara High*

12  *Sch. Dist.*, 48 F. Supp. 2d 1225, 1232 (C.D. Cal. 1998).  To prevail on his IIED claim, plaintiff

13  must prove that an individual County employee is liable for IIED.

14                 Defendants argue plaintiff fails even to allege any individual engaged in

15  sufficiently outrageous conduct.  (ECF 9 at 16-17.)  Plaintiff counters generally, without citing to

16  any case or to any specific facts, that Prieto's and other deputies' use of the slurs "gravy" and

17  "dark one" alone is sufficiently outrageous.  (ECF 10 at 12.)  A claim for intentional infliction of

18  emotional distress requires plaintiff to demonstrate: 1) the defendant engaged in extreme and

19  outrageous conduct; 2) the defendant intended to cause or recklessly disregarded the probability

20  of causing emotional distress; 3) plaintiff experienced severe emotional suffering; and 4) actual

21  and proximate causation of the emotional distress.  *Romero v. Akal Sec., Inc.*, No. 09 CV 00024

22  BEN (PCL), 2010 WL 1688163, at *6 (S.D. Cal. April 23, 2010) (citing *Molko v. Holy Spirit*

23  *Ass'n*, 46 Cal. 3d 1092, 1120 (Cal. 1988)).

24                 The court grants summary judgment on the IIED claim in favor of defendants.

25  Plaintiff does not provide evidence of sufficiently outrageous conduct by any individual County

26  employee(s).  Prieto's  and other deputies' use of "gravy" and "dark one" several times over a

14

1   two-week period simply does not rise to the level of outrageous conduct that IIED claims are

2   meant to deter.  *Cf. Cochran v. Cochran*, 76 Cal. Rptr. 2d 540, 544-45 (Cal. Ct. App. 1998)

3   ("[M]ajor outrage is still essential to the tort [of IIED]; and the mere fact that the actor knows

4   that the other will regard the conduct as insulting, or will have his feeling [sic] hurts, is not

5   enough.") (quotations and citation omitted); *Hegelson v. American Int'l Grp., Inc.*, 44 F. Supp.

6   2d 1091, 1095 (S.D. Cal. 1999) ("not enough that the defendant has acted with an intent which is

7   tortious or even criminal, or that he has intended to inflict emotional distress, or even that his

8   conduct has been characterized by 'malice', or a degree of aggravation which would entitle the

9   plaintiff to punitive damages for another tort"; for liability, conduct must be "so outrageous in

10  character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be

11  regarded as atrocious, and utterly intolerable in a civilized community." (citing *Cochran*, 76 Cal.

12  Rptr. 2d at 545) (quotations and citation omitted); *Alcorn v. Anbro Eng'g, Inc.*, 2 Cal. 3d 493,

13  496-97 (Cal. 1970) (holding a black plaintiff's IIED claim survives demurrer where plaintiff's

14  supervisor violently shouted "You goddam [sic] niggers . . . I don't want any niggers working for

15  me.  I am getting rid of all the niggers" before firing plaintiff).

16          D.      Negligence

17              Defendants argue plaintiff's negligence claim is in substance a negligent infliction

18  of emotional distress ("NIED") claim, as the alleged damages are emotional distress damages

19  and loss of earnings flowing therefrom, and as plaintiff does not allege any physical injury.

20  (ECF 9 at 17.)  Defendants then assert that NIED is not a cognizable legal claim in California;

21  there is only negligence, which requires proof of a duty toward the plaintiff.  (*Id.* (citing *Gu v.*

22  *BMW of N. Am., LLC*, 132 Cal. App. 4th 195, 204 (Cal. App. Ct. 2005)).)  Defendants argue

23  courts have found a duty to avoid causing emotional distress only in limited circumstances.  (*Id.*

24  (citing *Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 1001 (Cal. 1993)).)  Those limited

25  circumstances exist when the defendant has assumed a duty to the plaintiff in which the

26  plaintiff's emotional condition is an object, or when the emotional distress arises out of and is

15

1    proximately caused by the defendant's breach of some other legal duty.  (*Id.* (citing *Potter*, 6

2    Cal. 4th at 984).)  Because plaintiff has not alleged defendants have assumed a duty in which

3    plaintiff's emotional condition is an object, defendants argue plaintiff's negligence claim fails.

4    (*Id.* at 17-18.)  Inasmuch as plaintiff alleges the legal duty defendants breached is defendants'

5    obligations under FEHA, then plaintiff's cause of action is under FEHA, not negligence.  (*Id.*)

6          Plaintiff agrees with defendants' characterization of his negligence claim and that

7    the legal standard in *Potter* applies.  (ECF 10 at 12.)  Plaintiff cites cases supporting the use of

8    statutes as the applicable standard of care in negligence cases.  (*Id.* (citing *Ramirez v. Plough,*

9    *Inc.*, 6 Cal. 4th 539, 546-47 (Cal. 1993); *Myrick v. Mastagni*, 111 Cal. Rptr. 3d 165, 1089 (Cal.

10    Ct. App. 2010).)  Plaintiff argues FEHA compliance is the duty defendants owed plaintiff,

11    which the County then breached: "Here, Plaintiff suffered emotional distress because of the

12    County's breach of its legal duty to take reasonable steps to immediately and effectively end

13    racial harassment."  (ECF 10 at 13.)

14          Plaintiff's negligence claim fails as a matter of law.  Even if the court accepted

15    plaintiff's negligence per se standard, the law does not countenance plaintiff's theory, which is

16    that the County, a public entity, breached its duty of care as supplied by FEHA by permitting

17    racial harassment of plaintiff.  A public entity like the County can only be found liable for

18    common law tort causes of action when an individual employee was negligent.  *Davison*,

19    48 F. Supp. 2d at 1232 (dismissing plaintiff's negligence, NIED, and IIED claims against a

20    public entity because "'the practical effect of [Government Code § 815] is to eliminate any

21    common law governmental liability for damages arising out of torts'") (quoting California's

22    Senate Legislative Comm., Comment to CAL. GOV'T CODE § 815).  Plaintiff does not argue that

23    any individual County employee was negligent; therefore, his negligence claim cannot proceed

24    under a vicarious liability theory.  Additionally, as the court has found no actionable harassment

25    or discrimination under FEHA, defendants cannot have breached their duty under FEHA.

26    Therefore, the court grants defendants summary judgment on plaintiff's negligence claim.

IV.     <u>CONCLUSION</u>

        For the foregoing reasons, defendants' motion for summary judgment is GRANTED in its entirety.  This case is closed.

        IT IS SO ORDERED.

DATED:  February 21, 2013.

_____
UNITED STATES DISTRICT JUDGE